# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA
# FORT WAYNE DIVISION

| | | |
|---|---|---|
| WILLIE HENDERSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO. 1:09-CV-268-TLS |
| | ) | |
| KEN FRIES, ALLEN COUNTY SHERIFF, | ) | |
| *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

This matter is before the Court on a Joint Motion for Summary Judgment [ECF No. 57], filed by the Defendants on January 31, 2011; a Joint Request for Entry of Judgment [ECF No. 61], filed by the Defendants on April 12; and a Motion to Dismiss with Prejudice [ECF No. 63], filed by the Plaintiff on May 4.

## BACKGROUND

The Plaintiff, Willie Henderson, filed a Complaint [ECF No. 1] on September 23, 2009. The Complaint was signed by his attorneys, Christopher C. Myers and Ilene M. Smith, who filed their Appearance [ECF No. 3] on the Plaintiff's behalf. Along with the Complaint and counsels' Appearance, the Plaintiff filed an Affidavit of Indigence (in Forma Pauperis) [ECF No. 2] in which the Plaintiff declared under penalty of perjury that he is unable to pay the costs of these proceedings. The Affidavit also stated that the Plaintiff was incarcerated, that he was unemployed, that the only money he had received in the last twelve months was pay in prison, that he had no cash, checking account, or savings account, and that he owned no tangible or intangible property. The Court granted the Plaintiff's application to proceed in forma pauperis.

On October 28, the Defendants filed an Answer [ECF No. 11]. On November 13, Attorney Myers filed a Certification [ECF No. 15] stating that he had disclosed to his client the anticipated fees and expenses that are likely to be incurred during each phase of these proceedings through final disposition.

On March 9, 2010, the Plaintiff filed a First Amended Complaint [ECF No. 23], which was signed by counsel. In his Amended Complaint, the Plaintiff, a prisoner at the Allen County Jail, alleges that the Defendants violated his federally protected rights under the Eighth and Fourteenth Amendments to the Constitution of the United States when they denied him adequate medical care during the period of August 2008 to November 2008. More specifically, he alleges that the Defendants violated his rights through the following:

> [T]hey performed actions and/or assisted in depriving the Plaintiff of adequate medical care for his serious health condition, i.e., prevented the Plaintiff from receiving follow-up care with an orthopedic surgeon and withheld the necessary follow-up orthopedic care because Plaintiff was indigent and could not provide $336.50 up front for his follow-up orthopedic appointments, and declined to schedule such orthopedic appointments for him because he could not come up with the funds, because he was indigent, thus depriving Plaintiff of necessary medical care for his serious medical needs.

(ECF No. 23 at 2.) Apparently, the Plaintiff's left hand/wrist was fractured during his attempt to evade arrest on September 15, 2008. After the incident, the police took the Plaintiff to a local hospital to receive medical care prior to being booked into the jail. At the hospital, he was diagnosed with the fracture, and his wrist was splinted. A care provider at the hospital instructed him to follow-up with an orthopedic surgeon, and he asked the jail to arrange follow-up care with an orthopedic surgeon and place a cast on his wrist. His claims are brought pursuant to 42 U.S.C. § 1983, and he seeks compensatory damages, punitive damages, attorney's fees, and costs. Answers [ECF No. 29 & 42] were filed by Defendants on April 6 and August 24. On

September 17, Defendant Linda Richards was dismissed pursuant to a Joint Stipulation to Dismiss [ECF No. 44]. On October 4, 2010, the discovery period ended.

On October 25, the Court conducted a telephonic status conference with counsel, and the dispositive motions deadline was set for January 31, 2011. On January 31, the Defendants filed a Joint Motion for Summary Judgment [ECF No. 57], which was accompanied by approximately 180 pages of evidentiary materials in support of their Motion. The Defendants also filed a 24-page Joint Brief in Support [ECF 58] and a 13-page Joint Statement of Material Facts [ECF No. 58-1]. In their Motion for Summary Judgment, the Defendants thoroughly addressed relevant facts, which they supported with citations to particular parts of their evidentiary submissions, and argued points and authorities in support of their Motion. On February 28, the date on which the Plaintiff's response was due, the Plaintiff filed a Motion for Extension of Time [ECF No. 59] requesting thirty additional days (up to and including March 30) to respond because Plaintiff's counsel were busy with travel, preparing pleadings, and performing other tasks in a number of other cases. The Court granted the Plaintiff's Motion extending the response deadline, but the Plaintiff never filed a response to the Defendants' Motion for Summary Judgment. On April 12, the Defendants filed a Joint Request for Entry of Judgment [ECF No. 61], highlighting that the Plaintiff failed to respond to their Joint Motion for Summary Judgment and requesting that the Court enter summary judgment for the Defendants and against the Plaintiff and award them costs. On April 28, the Plaintiff filed a Report [ECF No. 28], stating that counsel had made some recommendations to the Plaintiff, were awaiting his response, and anticipated filing a motion to dismiss the case.

On May 4, the Plaintiff filed a Motion to Dismiss with Prejudice [ECF No. 63], asking

that the Court dismiss the Plaintiff's claims against the Defendants and stating the view of Plaintiff's counsel that the Plaintiff's Motion rendered the Defendants' Motion for Summary Judgment moot. On May 10, the Defendants filed an Objection [ECF No. 64], requesting the entry of judgment in their favor and seeking to ensure that the Defendants are determined to be the prevailing parties in this case. They also renewed their request that judgment be entered in their favor based upon their pending Motions and claimed that they are entitled to file a bill of costs to recover attorney fees, litigation expenses, and expert witness fees. On May 17, the Plaintiff filed a Reply [ECF No. 65], explaining that the Plaintiff disagrees that fees and costs should be awarded but that the Plaintiff did not condition his Motion to Dismiss with Prejudice on the Defendants' waiving any right to seek fees and costs. In the Plaintiff's Reply, counsel for the Plaintiff also highlighted problems and difficulties counsel encountered in obtaining the Plaintiff's cooperation (including the Plaintiff's failure to authorize and provide funds to hire an expert witness) and in communicating with the Plaintiff. Plaintiff's counsel also noted that there was miscommunication between the Plaintiff's two attorneys. In the Reply, Plaintiff's counsel explained that the Plaintiff had authorized them to settle the case for whatever could be recovered and that, after the Plaintiff and one of the Defendants were deposed in the fall of 2010, Plaintiff's counsel recommended that the parties resolve their dispute with a mutual walk-away agreement. The Plaintiff's Reply also stated that Plaintiff's counsel filed a motion to withdraw that was later withdrawn, but the Court's record does not reflect that any such motion was filed.

On May 20, the Court conducted a telephonic status conference to discuss the pending Motions and to inquire about the procedural posture of this case. The Court also took the pending Motions under advisement.

## SUMMARY JUDGMENT STANDARD

The Federal Rules of Civil Procedure provide that a court shall grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists when "'there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.'" *AA Sales & Assocs. v. Coni-Seal, Inc.*, 550 F.3d 605, 608–09 (7th Cir. 2000) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986)). A court's role on summary judgment is not to weigh the evidence, make credibility determinations, or decide which inferences to draw from the facts, but instead to determine whether there is a genuine issue of triable fact. *Anderson,* 477 U.S. at 255; *Washington v. Haupert*, 481 F.3d 543, 550 (7th Cir. 2007); *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). A court in ruling on a summary judgment motion construes all facts in the light most favorable to the nonmoving party and draws all reasonable inferences in that party's favor. *AA Sales & Assocs.*, 550 F.3d at 609. A party opposing a properly supported summary judgment motion may not rest on bare pleadings alone, but must use the evidentiary tools listed in Rule 56 to designate specific material facts showing that there is a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Insolia v. Philip Morris, Inc.*, 216 F.3d 596, 598 (7th Cir. 2000); N.D. Ind. L.R. 56.1(b). Thus, the nonmovant must "marshal and present the court with the evidence she contends will prove her case." *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010).

## UNDISPUTED FACTS

The Defendants have come forward with admissible evidence showing the following facts, and the Plaintiff has not disputed these facts. *See* Fed. R. Civ. P. 56(e)(2) & (3) ("If a party . . . fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion [or] grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it.").

On September 15, 2008, the Plaintiff was arrested at his girlfriend's residence for a parole violation. Before officers could apprehend him, the Plaintiff fled out the back window of the residence and, in the process, fell on the concrete outside the window. The Plaintiff sustained an injury to his left hand as a result of the fall. Prior to being taken to the Allen County Confinement Facility (the jail), the Plaintiff was transported to St. Joseph Hospital. An X-ray revealed a closed oblique fracture to the fifth metacarpal shaft of his left hand. Jeffrey A. Yablong, M.D., the emergency room physician, applied a hand ulnar gutter splint to the Plaintiff's left hand. The splint had the appearance of a cast, and it became stiff after the application of water. Dr. Yablong prescribed Vicodin and recommended that the Plaintiff follow up in the orthopedic clinic at the hospital.

On September 16, at around 1:30 a.m., the Plaintiff arrived at the jail. A health appraisal was conducted as part of the intake process. During the health appraisal, the Plaintiff disclosed that he fractured his left hand prior to the arrest, had been seen at St. Joseph Hospital, and was prescribed Vicodin. The Plaintiff was given one Vicodin for his pain during the intake process. As noted during the health appraisal, the Plaintiff had diabetes and hypertension, for which he had not be taking his medications on a regular basis for a year prior to his arrest. The plan was to

monitor these conditions and request orders for the Plaintiff's prescriptions from a health clinic that serves indigent patients. The Plaintiff authorized jail nursing personnel to obtain the doctor's orders for his prescriptions, and he was placed on a restricted medical diet for his diabetic condition.

On September 18, a nurse's note indicated that the Plaintiff's splint had fallen off his hand. Nurse Amanda Ross contacted St. Joseph Hospital and was advised that the Plaintiff had a fractured left hand and that the splint should be re-applied with an ACE bandage wrap over it. Circulation checks were already in place, and a note was made that the splint was not to be removed again. Nurse Ross also noted that a "[f]ollow up with ortho already in place." (Henderson Dep. 48; Ex. D at 53.) On September 24, St. Joseph Hospital sent a fax to the jail regarding the service request for the Plaintiff to have an appointment in the Orthopaedic Center and X-ray. St. Joseph Hospital informed the jail that the cost would be $336.50, payable before service would be rendered. On September 25, the Plaintiff was notified of the upfront cost required by the hospital and asked to advise when he had the funds in his account. The Plaintiff knew that the hospital required payment for the requested medical services and that this was not a requirement imposed by the jail.

Linda Richards, a certified physician's assistant, saw the Plaintiff in the jail on October 2 for his complaints of left hand pain.[1] Richards noted the history of a "boxer's" fracture, which is also known as a fracture of the fifth metacarpal. Richards examined the Plaintiff's left hand finding that his fingers were warm and pink (showing good circulation of blood to the distal

---

[1] Linda Richards worked for Emergency Medicine of Indiana (EMI), the physician group that provided medical services to the inmates during the Plaintiff's period of incarceration at the jail. EMI provided physicians and physician assistants to staff the sick call visits.

7

extremity/his fingers) and the signs of healing. The Plaintiff was able to wiggle his fingers well, and he had two plus (2+) radial pulse, which is a normal pulse for the radial artery. These findings indicated good blood supply to the fractured area. During the October 2 visit, Richards removed the splint to examine the Plaintiff's left hand for pressure marks, "which is a luxury you have when something's in a splint, that you don't have when it's in a cast." (Richards Dep. 19.) The splint was placed back on his left hand and wrapped with a new ACE bandage in order "[t]o maintain immobility of the fractured area . . . and promote bone healing." (Richards Dep. 21.) Richards described the splint on the Plaintiff's hand as a volar splint, which is made of Ortho-glass and (after contact with water) hardens over a period of time becoming a half cast. Based upon her examination and her training and experience, Richards was satisfied that the Plaintiff's fracture was healing as expected. The treatment plan was to offer him Ibuprofen, 800 milligrams, twice a day, which doubled the recommended dosage on over-the-counter bottles.

Richards saw the Plaintiff next on October 7 because of his complaint of a bloody penile discharge. The Plaintiff also expressed concern that he was no longer receiving daily sugar and blood pressure checks. As a result of her examination, Richards ordered a urinalysis and re-instituted daily checks of blood pressure and weekly checks of blood sugar "to keep his mind at ease that his diabetes and hypertension were under control." (Richards Dep. 27.) During this sick call visit, the Plaintiff did not complain about pain or discomfort related to his fracture. Following receipt of the urinalysis results, Richards had the Plaintiff return to sick call the next day because the urinalysis findings indicated an infection. Richards examined him again on October 10, and he was treated with Rocephin, 500 milligrams intramuscularly, and Zithromax, one gram orally. The Plaintiff continued to have blood pressure and sugar checks, and Richards

reviewed the readings, which were within normal limits.

On October 18, the Plaintiff requested to be seen at sick call for an evaluation of his hand. Richards saw him on that same day to evaluate his hand. Her examination revealed that he was able to move his fingers well, that his nail beds were pink, that his hand was warm, and that there was no skin breakdown. Richards told him that he could remove the splint twice a day for skin care and range of motion. Richards testified that most fractures heal in four to six weeks, and it had been four weeks since his hand was fractured, so it was appropriate to let him remove his splint "to get a little strength in the muscles and ligaments, to start practicing moving the fingers better, and moving the joints above and below the fracture, that would help him heal." (Richards Dep. 34.)

Richards did not order the Plaintiff to return to the hospital as a result of his hand fracture. However, if he had displayed signs or symptoms indicating further treatment was necessary, she would have sent him back to the hospital emergency department where he could be seen by an orthopedic doctor. Based upon her observations, Richards did not believe the Plaintiff needed to be seen by an orthopedic doctor. She examined his hand for symptoms each time he was evaluated for his hand, and he did not exhibit any symptoms necessitating a referral to an orthopedic doctor. In Richards's view, "[h]is exams were normal." (Richards Dep. 45.)

On October 28, Richards again evaluated the Plaintiff and his need for the splint. Five weeks had passed since the Plaintiff sustained the fracture, and he exhibited good range of motion and good circulation in, sensation to, and movement of his left hand. Richards allowed him to remove the splint at night for the next couple of weeks and then to discontinue use of the splint. Richards recommended that he increase his range of motion exercises and do them on a

9

daily basis. At no time after October 28 did the Plaintiff request to be seen at sick call.

On November 6, the Plaintiff was released from the jail and transported to Plainfield Correctional Facility. On November 11, Michael Person, M.D., at the Plainfield Correctional Facility saw the Defendant regarding his high blood pressure and diabetes. Dr. Person ordered an X-ray of the Plaintiff's left hand and applied a cast, but he did not order any medication. Additionally, Dr. Person did not perform any surgery on his left hand. The Plaintiff never saw an orthopedic doctor while at Plainfield Correctional Facility or after being released from prison.

Dr. Niles Schwartz, a board certified orthopedic surgeon, reviewed the medical records from St. Joseph Hospital, the jail, and the Plainfield Correctional Facility, considered the standard of care provided by nursing and physician assistant staff at the Allen County Jail, and expressed the following medical opinion:

> As my summary states and based upon the records I reviewed, the responses of the Allen County Jail to Mr. Henderson's requests for an appointment at the St. Joseph Orthopaedic Clinic were appropriate. . . . There was no reason for the jail staff to consider his requests for an appointment at the St. Joseph Orthopaedic Clinic as an emergency.
>
> In my medical opinion, the medical treatment provided for the treatment of Mr. Henderson's metacarpal fracture met the standard of care, and there was no delay in rendering any treatment. It is common practice to treat minimally displaced metacarpal shaft fractures, such as Mr. Henderson's, using a splint and not a cast. Based on my review of the medical records, it is my opinion that the jail staff were not deliberately indifferent to Mr. Henderson's medical care, including the treatment of the metacarpal fracture.

(Schwartz Aff. ¶¶ 5 & 6.) Dr. Schwartz's summary, which was based on reasonable medical certainty, also stated:

> [T]he medical treatment of Mr. Henderson's metacarpal fracture has met the standard of care. Furthermore, it is my opinion that there is no evidence of deliberate indifference to Mr. Henderson's hand fracture care.

> With regards to the standard of care, it is common practice to treat minimally displaced distal metacarpal shaft fractures using a splint and not a cast.
>
> . . .
>
> . . .
>
> The fact that Mr. Henderson was treated by a physician's assistant and not an orthopedic surgeon also meets the standard of care in this case. Many minimally displaced fractures are treated by primary or family practice doctors or physician's assistants or physician's extenders including nurse practitioners. It is common in my particular practice for my physician's assistant to evaluate and treat an injury such as this until it heals.
>
> It is my opinion that Mr. Henderson's hand fracture was not treated with deliberate indifference. He was treated and evaluated in the St. Joseph Emergency Room on September 16th by Dr. Yablong. Attempts were made to have him seen at the Orthopedic Clinic only per Dr. Yablong's request. Treatment was then rendered in a reasonable fashion by Linda Richards, the physician's assistant, for emergency medicine, until the patient was transferred to the Plainfield Correctional Facility.

(Schwartz Aff. ¶ 4; Ex. B.)

The Allen County Jail and Lock Up Standard Operating Procedures on Health Services provide: "Matters of medical, mental health and dental judgment [are] the sole province of the responsible physician, psychiatrist and dentist providing health care services in the Allen County Jail/Lock Up." (Jail Standard Operating Procedures concerning Health Services ("Policy"), SOP No. J-02, p. 1 of 1, produced in response to Plaintiff's Second Set of Interrogatories, Answer to Interrogatory No. 1(d), ECF No. 57-8.) The policy also provides that the jail will employ or contract with physicians to conduct physical examinations and sick call and employ nursing personnel to assist with sick call. Nursing personnel are to initiate treatment only upon the written or verbal orders of a licensed physician or his/her designee.

In accordance with Indiana law, an inmate may be required to pay for ongoing, non-emergency medical treatment for a pre-existing condition that he has requested be provided from

a private physician or facility. The Allen County Sheriff's Department provides medical care for inmates as ordered by the jail health providers, physician assistants, and physicians. These medical professionals may decide that medical treatment outside of the jail is necessary on an individual basis. When a jail physician or physician assistant orders medical treatment, inmates are not required to have funds in their inmate accounts to cover the costs of such medical treatments. However, if the jail physician or physician assistant does not order a particular medical treatment requested by an inmate, then the inmate may be required to pay for ongoing, non-emergency medical treatment for a pre-existing condition to be rendered by an outside facility. Matters of medical judgment are the sole province of the physician or physician assistant providing the medical care to the inmate, and this physician or physician assistant determines the treatment the inmate is to receive on a case-by-case basis.

In his Answers to the Plaintiff's Second Set of Interrogatories, Sheriff Kenneth C. Fries spoke regarding the nursing and medical care provided to the Plaintiff at the jail. Regarding the policy or custom in place with respect to an inmate's right to receive medical care even though the inmate is indigent and without funds to pay for medical services, the sheriff testified:

> Mr. Henderson was required to pay for the medical treatments only if they were not ordered by the jail health care providers (physician assistants and physicians). Had the jail physician and/or physician assistant ordered these treatments, Mr. Henderson would not have been required to have funds in his inmate account to cover the costs. In accordance with Indiana law, an inmate may be required to pay for ongoing, non-emergency medical treatment for a pre-existing condition he requests to be provided from a private physician or facility. The Allen County Sheriff's Department provides medical care as ordered by the jail healthcare providers, physician assistants and physicians, and these medical professionals may decide "outside of jail" medical treatment is necessary on an individual basis.
>
> Matters of medical judgment are the sole province of the responsible physician and/or physician assistant providing health care to the inmate. The

responsible physician and/or physician assistant providing health care to the
inmate determines the treatment of an inmate on a case-by-case basis.

(Sheriff Fries Interrog. Answer No. 6, ECF No. 57-8.)

Defendant Pamela Thornton, R.N., the Director of Health Services, has provided the following explanation as to why the Plaintiff was not allowed to see a physician for his hand/wrist from September 16 through November 6, 2008:

> Matters of medical judgment are the sole province of the responsible physician or physician assistant providing healthcare services in the Allen County Jail. Nursing personnel initiate treatment only upon the written or verbal orders of these healthcare professionals. The nursing staff relies upon the professional judgment of qualified medical professionals such as physicians and physician assistants.

(Nurse Thornton Interrog. Answer No. 5, ECF No. 57-9.)

The Plaintiff wrote several grievances while incarcerated at the jail. Ellen Chamar, a part-time nurse at the jail, answered one grievance, advising the Plaintiff of St. Joseph Hospital's requirement that he must pay up-front for the medical services requested. The Plaintiff has not disclosed any evidence of wrongdoing by Defendant Ellen Chamar or Defendants Mary Jane Collins, LPN (identified in the caption as "C/OP.E. #071"), C. ***CE (P.E. #277) (identified as C. Chase), P.E. #C935, or unidentified Allen County Jail staff (John/Jane Does). Nurse Thornton answered the three other grievances, and the Plaintiff's grievances were his only interaction with Nurse Thornton. The Plaintiff has asserted that Nurse Thornton prevented him from seeing an orthopedic physician while incarcerated at the jail, but he has come forward with no evidence in support of that assertion. With each grievance Nurse Thornton received, she deferred to the physician's assistant regarding the Plaintiff's medical care, and she responded by promptly sending him to the physician's assistant in sick call. The Plaintiff has admitted that he never

talked to Sheriff Fries, never sent him a grievance, and never had any contact with the Sheriff while he was incarcerated at the jail.

## DISCUSSION

The Defendants have moved for the entry of summary judgment in their favor on the Plaintiff's Eighth and Fourteenth Amendment claims, and the Plaintiff has not opposed the Defendants' request. The Plaintiff contends that the Defendants' Joint Motion for Summary Judgment is rendered moot by the Plaintiff's filing of his Motion to Dismiss with Prejudice. The Defendants have objected to the Plaintiff's Motion and have renewed their request that the Court enter judgment in their favor. Under Federal Rule of Civil Procedure 41, the Plaintiff can voluntarily dismiss his action this late in the proceeding only by court order and only "on terms that the court considers proper." Fed. R. Civ. P. 41(a)(2). "Motions for voluntary dismissal are committed to the district court's discretion, but it is an abuse of discretion for the district court to permit the voluntary dismissal of an action where the defendant would suffer plain legal prejudice as a result." *Wojtas v. Capital Guardian Trust Co.*, 477 F.3d 924, 927 (7th Cir. 2007). In this case, dismissal under Rule 41(a)(2) could only be with prejudice, and that is what the Plaintiff requests in his Motion. However, the Plaintiff's Motion was filed only after discovery was completed and after the Defendants prepared and filed a Joint Motion for Summary Judgment (together with a supporting Brief and evidentiary materials) and a Joint Request for Entry of Judgment. Considering the procedural background of this case and the evidentiary record and legal issues before the Court, the Court determines that the best course of action that ensures that the Defendants suffer no legal prejudice is to rule on the Defendants' unopposed

14

Joint Motion for Summary Judgment and order the entry of judgment in favor of the Defendants.

A prisoner may pursue an action under 42 U.S.C. § 1983 against a person who violates the prisoner's Eight Amendment rights while acting under the color of state law.[2] *Berry v. Peterman*, 604 F.3d 435, 439 (7th Cir. 2010). One Eighth Amendment protection is a prisoner's right to adequate medical care, and the Eighth Amendment test focuses on whether the defendant was deliberately indifferent to the plaintiff's serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976).

To succeed on an Eighth Amendment cruel and unusual punishment claim for deliberate indifference to medical needs, a plaintiff must "show (1) that he suffered from an objectively serious medical condition; and (2) that the individual defendant was deliberately indifferent to

---

[2] The Defendants analyze the Plaintiff's claim under the deliberate indifference standard under the Eighth and Fourteenth Amendments. The Eighth Amendment ban on "cruel and unusual punishments" applies to convicted persons, but the Due Process Clause of the Fourteenth Amendment provides protection to pretrial detainees. *See Minix v. Canarecci*, 597 F.3d 824, 830–31 (7th Cir. 2010). In their analysis, the Defendants treat the Plaintiff as a prisoner under the Eighth Amendment. The Plaintiff's status is questionable because he was arrested and detained for a parole violation, and authority is divergent as to whether his status is as a prisoner under the Eighth Amendment or a pretrial detainee under the Fourteenth Amendment. *See Paith v. County of Wash.*, 394 Fed. Appx. 858, 860 n.2 (citing *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983), and *Boring v. Kozakiewicz*, 833 F.2d 468, 472 (3d Cir. 1987)) (treating plaintiff incarcerated pursuant to a parole violation detainer as a pretrial detainee under the Due Process Clause of the Fourteenth Amendment); *Flores v. Mesenbourg*, 116 F.3d 483 (9th Cir. 1997) (treating plaintiff confined as a result of a parole violation as a prisoner under the Eighth Amendment); *Cook v. Faulkner*, 77 F.3d 478 (5th Cir. 1996) (per curiam) (citing *Rankin v. Klevenhagen*, 5 F.3d 103, 106 (5th Cir. 1993) (noting *Rankin*'s suggestion that the Eighth Amendment would apply to plaintiff who was on parole from an earlier conviction and sentence, observing that Rankin did not require a conclusive determination of the issue, and concluding that the court need not determine which standard is applicable to a pretrial detainee arrested while on parole); *Tittle v. Jefferson County Comm'n*, 10 F.3d 1535, 1539 n.3 (11th Cir. 1994) (noting that plaintiff was being held pending a hearing for an alleged violation of parole but declining to determine whether he had pretrial detainee or prisoner status). The Court need not resolve this question because "the recognized standard of protection afforded to both convicted prisoners and pretrial detainees under the Eighth and Fourteenth Amendments" is the same. *Palmer v. Marion County*, 327 F.3d 588, 593 (7th Cir. 2003); *see also Minix*, 597 F.3d at 831 (stating that courts "apply the same legal standards to deliberate indifference claims brought under either the Eighth or Fourteenth Amendment"). Although the Court need not (and does not) precisely determine the Plaintiff's status, the Court will frame its discussion here as the Defendants do in Eighth Amendment terms.

that condition." *Berry*, 604 F.3d at 440. For the objective element, a court considers whether a medical condition is serious. *Id.* A medical condition is serious if it "is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would perceive the need for a doctor's attention." *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005). With the subjective element, a court considers what a defendant knows about a plaintiff's condition "and whether the course of treatment was so far afield as to allow a jury to infer deliberate indifference." *Duckworth v. Ahmad*, 532 F.3d 675, 680 (7th Cir. 2008); *see also Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010) ("[A]n official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.") (quotation marks and citations omitted). Conduct is deliberately indifferent "when the official has acted in an intentional or criminally reckless manner, *i.e.*, the defendant must have known that the plaintiff was at serious risk of being harmed and decided not to do anything to prevent that harm from occurring even though he could have easily done so." *Board v. Farnham*, 394 F.3d 469, 478 (7th Cir. 2005) (quotation marks and citations omitted). "Deliberate indifference requires a showing of more than mere or gross negligence, but less than purposeful infliction of harm." *Knight v. Wiseman*, 590 F.3d 458, 463 (7th Cir. 2009). For a medical professional to be held liable for deliberate indifference to an inmate's medical needs, he or she must make a decision that represents "such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Jackson v. Kotter*, 541 F.3d 688, 697 (7th Cir. 2008) (quotation marks and citations omitted). When considering whether care provided to an inmate evidences deliberate indifference to his serious medical needs, a court does not look to

incidents in isolation, but considers the totality of his medical care. *Walker v. Peters*, 233 F.3d 494, 501 (7th Cir. 2000); *Gutierrez v. Peters*, 111 F.3d 1364, 1375 (7th Cir. 1997).

The record before the Court, even when viewed in a light most favorable to the Plaintiff, does not establish that the Defendants were deliberately indifferent to the Plaintiff's medical needs. The Plaintiff's left hand was fractured during his attempt to evade arrest. He received medical care (including a splint) at a hospital before he was transported to and processed into the jail. He was seen by nursing staff and at sick call by a physician's assistant for various complaints including some related to his hand, and he received follow-up care on multiple occasions from a physician's assistant at the jail to ensure that the Plaintiff's fracture was healing. Based upon her examination and care for the Plaintiff, the physician's assistant determined that further treatment of the Plaintiff's left hand at the hospital was not necessary and that the Plaintiff did not need to be seen by an orthopedic doctor. The Plaintiff also received medication for pain. The evidence before the Court shows that jail medical personnel were responsive to his complaints, that the Plaintiff received reasonable and adequate medical care while incarcerated at the jail, and that the care provided was within the standard of care.

Additionally, when a prisoner "'is under the care of medical experts . . . a non-medical prison official will generally be justified in believing that the prison is in capable hands.'" *Greeno*, 414 F.3d at 656 (quoting *Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004)). Consequently, when Defendants Chamar and Thornton relied on the expertise of the medical providers to deny the Plaintiff's grievances, they were not deliberately indifferent to the Plaintiff's medical needs.

The doctrine of respondeat superior, under which a supervisor may be held liable for an

employee's actions, does not apply to § 1983 actions, and thus to be held individually liable, a defendant must be personally responsible for the deprivation of a constitutional right. *Sanville v. McCaughtry*, 266 F.2d 724, 740 (7th Cir. 2001). There is no evidence that Defendant Fries had any direct, personal involvement in any alleged denial of medical care or that any alleged violations of the Plaintiff's constitutional rights occurred at Defendant Fries's direction or with his knowledge and consent. Furthermore, there is no evidence that Defendant Fries had a widespread practice, policy, or custom of ignoring the serious health needs of inmates, either by refusing to allow medical care or interfering with medical care.

Although the Plaintiff may have wanted an orthopedic physician to see his hand, nothing in the record suggests that he needed to be seen by a specialist. The Seventh Circuit has instructed that the Eighth Amendment does not require that prison doctors treat prisoners in the exact manner they demand, *Jackson*, 541 F.3d at 697–98, or that prisoners receive "unqualified access to health care," only "adequate medical care," *Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006) (quotation marks and citations omitted). Additionally, the court has stated that the Eighth Amendment does not confer a right to demand either a particular type of medical treatment or a certain specialist. *Kendrik v. Frank*, 310 F. App'x 34, 38 (7th Cir. 2009) (citing *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997)).

Simply put, there is no evidence before the Court showing that any of the Defendants were deliberately indifferent to the Plaintiff's medical needs and thereby violated his rights or that the Plaintiff suffered an actual injury or detrimental effect as a result of his treatment at the jail or any delay in providing medical treatment. Because no reasonable jury could conclude that the Defendants' actions amounted to deliberate indifference to a serious medical need, the

Defendants are entitled to judgment as a matter of law.

## CONCLUSION

For the foregoing reasons, the Court GRANTS the Defendants' Joint Motion for Summary Judgment [ECF No. 57] and DENIES AS MOOT the Defendants' Joint Request for Entry of Judgment [ECF No. 61] and the Plaintiff's Motion to Dismiss with Prejudice [ECF No. 63]. The Court ORDERS the Clerk of this Court to enter of judgment in favor of the Defendants and against the Plaintiff.

SO ORDERED on June 3, 2011.

 s/ Theresa L. Springmann
THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT
FORT WAYNE DIVISION